UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DANIEL A. BROWN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:21-cv-00101-JAW |
| | ) | |
| NBM RAIL SERVICES, INC., | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff seeks to recover damages under the Federal Employers Liability Act (FELA) against Defendant, his former employer, for injuries he suffered while removing fasteners on a railway. (Complaint, ECF No. 1.) Defendant requests summary judgment. (Motion, ECF No. 38.)

Following a review of the summary judgment record and after consideration of the parties' arguments, I recommend the Court grant in part and deny in part Defendant's motion for summary judgment.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact

reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the Plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* at 78 ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## SUMMARY JUDGMENT RECORD

### A. The Parties

Plaintiff is a resident of Orneville Township, in Piscataquis County, Maine. (Complaint ¶ 1.)[1]  Plaintiff worked for Eastern Maine Railway from June 2017 until December 2017. (Plaintiff's Statement of Additional Material Facts ¶ 1, ECF No. 42 (hereinafter PASMF).)

Defendant is a railroad business and is a subsidiary of Eastern Maine Railway Company. (Complaint ¶¶ 4-5; Notice of Interested Parties, ECF No. 6.) Defendant hired

---

[1] The parties did not include in their stipulations or statements of material facts certain relevant background information about the parties and the incident that is the subject of this lawsuit. For the sake of clarity, I have supplemented the parties' statements with certain information from other filings, which information does not appear to be in dispute.

Plaintiff on April 10, 2018, as a temporary track laborer. (Joint Statement of Stipulated Facts ¶ 2, ECF No. 35 (hereinafter JSSF).)

## B.  Railway Fasteners

A railway consists of steel running rails installed on crossties embedded in the ground and surrounded by stones known as ballast. (Defendant's Statement of Material Facts ¶ 1, ECF No. 39 (hereinafter DSMF).) Tie plates are located between the crossties and the running rails, forming a part of the system used to fasten the track components together and to disperse the load of the passing trains. (*Id.* ¶ 2.) The safety and efficacy of a railway demands the use of an appropriate system to fasten the running rails, tie plates, and crossties in place and to one another; in the absence of an appropriate fastening system, the forces applied by a train could move the rails out of position, creating a risk of derailment. (*Id.* ¶ 3.) There exists a variety of means to fasten a running rail to a crosstie. (*Id.* ¶ 4.)

One of the most prevalent means to fasten a running rail to a crosstie involves the use of cut spikes, which are angled, unthreaded spikes. (*Id.* ¶ 5.) The cut spike is driven through a square hole in the tie plate into the crosstie, with the angled head of the cut spike pressing down on the running rail, thereby securing the running rail in place, with additional cut spikes installed as necessary to secure the tie plates to the crossties. (*Id.* ¶ 6.) Another prevalent fastening system involves the use of an "elastic fastener," which functions as a clip attached to the tie plate to hold down the running rail. (*Id.* ¶ 7.) In such a system, a screw spike is used to bolt the tie plate to the crosstie. (*Id.* ¶ 8.) Unlike cut

3

spikes, screw spikes do not contact the running rail.  (*Id.* ¶ 9.)  Screw spikes are threaded and have flat washer heads.  (*Id.* ¶ 10.)

A railway turnout is the place where a train may be diverted from one track to another.  (*Id.* ¶ 12.)  A railway switch is the mechanism that diverts a train from one track to another.  (*Id.* ¶ 11.)  Cut spikes and screw spikes may be used in combination to fasten different components in a railway switch area.  (*Id.*)

### C.  Claw Bar Tool

Running rails, tie plates, crossties, and the attendant fastening systems require periodic maintenance and at times, replacement.  (*Id.* ¶ 14.)  In a project that requires the removal of running rails or crossties, track maintenance personnel must remove the fasteners used to secure the running rails and tie plates to the crossties, whether the fasteners are screw spikes or cut spikes.  (*Id.* ¶ 15.)  The tool used to remove the fasteners depends on the circumstances, including the condition of the running rail, tie plate, or fastener and the location of the fastener relative to other equipment.  (*Id.* ¶ 16.)

A claw bar is a specialized tool used in the railway industry to remove fasteners.  (*Id.* ¶ 18.)  A claw bar is an approximately five-foot long metal bar, with one end designed to slide underneath the head of a fastener.  (*Id.* ¶ 20.)  The user applies force to the end of a claw bar to lift the head of the fastener.  (*Id.* ¶ 21.)  The user can adjust the amount of force conveyed, backing off or ceasing to apply force entirely if the claw bar does not prove effective at removing the fastener.  (*Id.* ¶ 23.)  Unlike larger powered tools, such as a hydraulic spike puller or on-track maintenance machine, a claw bar conveys force based only on the manual force generated by the user.  (*Id.* ¶¶ 22, 23.)  A claw bar is particularly

useful for removing fasteners in switch areas, where many of the track components could be together in a tight space, making it difficult to use powered tools. (*Id.* ¶ 23.)

A track maintenance worker can attempt to remove both cut spikes and screw spikes with a claw bar provided the claw bar user can fit the end of the claw bar underneath the head of the fastener. (*Id.* ¶ 25.) If the fastener is too deeply embedded in the crosstie or is otherwise stuck, the user can cease using the claw bar. (*Id.* ¶ 28.)

**D.     Plaintiff's Experience and Injury**

Plaintiff worked most of his life as a truck driver. (Plaintiff's Declaration ¶ 2, ECF No. 42-2.) When he was employed by Eastern Maine Railway and Defendant, Plaintiff spent virtually all his time driving trucks or operating heavy equipment. (*Id.* ¶¶ 5, 10; JSSF ¶ 3.) Plaintiff was never trained in the use of a claw bar by Eastern Maine Railway or Defendant, and Plaintiff had never used a claw bar before the date of his injury. (PASMF ¶¶ 2–5.)

Defendant assigned Plaintiff's crew to work on a segment of rail track near Attleboro, Massachusetts. (JSSF ¶ 4.) The Attleboro project required Plaintiff's crew to remove a defunct rail switch and replace it with straight track. (*Id.* ¶ 5.) On April 17, 2018, Plaintiff performed his usual duties driving trucks and operating a loader, but eventually he completed the work. (Plaintiff's Declaration ¶ 11.) The foreman asked Plaintiff to assist the crew by removing screw spikes holding a switch in place. (*Id.* ¶¶ 12–13.) According to Plaintiff, the foreman told Plaintiff that the screws were normally removed with a hydraulic machine, but the machine was broken. (*Id.* ¶ 14.) Plaintiff asserts the foreman asked Plaintiff to use a claw bar because there was insufficient time to wait for another

hydraulic machine. (*Id.* ¶ 15–16; JSSF ¶ 8.)[2]  The claw bar Plaintiff used was free from any defects. (JSSF ¶ 9.) Prior to his injury, Plaintiff never complained about or objected to having to use a claw bar to remove screw spikes. (*Id.* ¶ 14.)

The first two screw spikes Plaintiff removed were in rotted wood, and Plaintiff removed the two screw spikes without incident. (*Id.* ¶ 11.) Plaintiff then attempted to remove a third screw spike. (*Id.*)[3] Plaintiff was able to fit the end of the claw bar underneath the head of the third screw spike and applied force to loosen and remove it. (*Id.* ¶ 12.) As Plaintiff pulled on the claw bar, he injured his left wrist. (*Id.* ¶ 13.) Plaintiff felt popping in his wrist and the immediate onset of pain. (Complaint ¶ 13.) Plaintiff experienced swelling and pain for a prolonged period and later had surgery on the wrist. (Excerpt of Plaintiff's Deposition at 115–16, 125–28, ECF No. 40-1 at 4–21.)

## DISCUSSION

The Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., "was enacted in 1908 to provide railroad workers with a federal remedy for personal injuries suffered as a result of the negligence of their employers or fellow workers." *Stevens v. Bangor & Aroostook R. Co.*, 97 F.3d 594, 597 (1st Cir. 1996). The statute does not impose "absolute liability" for all injuries, but "the standard of liability under the FELA is low," and the

---

[2] While Plaintiff did not include among his statement of additional material facts the referenced statements, he did include reference to various statements in his declaration, including paragraphs 14 and 15, in his qualified responses to some of Defendant's statement of material facts. (*See* Plaintiff's Opposition to Defendant's Statement of Material Facts ¶¶ 17, 18, and 24, ECF No. 42.)

[3] There is some dispute between the parties whether Plaintiff was tasked with removing a cut spike or a screw spike, but for purposes of the summary judgment motion, Defendant does not dispute Plaintiff's assertion that the fastener in question was a screw spike.

broad remedial statute is given a liberal construction. *Moody v. Bos. & Maine Corp.*, 921 F.2d 1, 3 (1st Cir. 1990). Certain defenses available to railroads under common law negligence actions, such as the doctrine of assumption of risk, were eliminated or curtailed. *See Tiller v. Atl. Coast Line R. Co.*, 318 U.S. 54, 58 (1943).

To recover, a plaintiff must prove that "employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (quoting *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957), and rejecting proximate cause requirement).

> [A FELA plaintiff] must show that his employer breached its duty to maintain a safe workplace, that he was harmed by that breach, and that the harm was foreseeable. The employer's duty to maintain a safe workplace does not require all dangers to be eradicated, but it does demand the elimination of those that can reasonably be avoided in light of the normal requirements of the job.

*Stevens v. Bangor & Aroostook R. Co.*, 97 F.3d 594, 598 (1st Cir. 1996).

**A.   Unsafe Tool Theory**

Plaintiff does not allege that the claw bar he used was defective in any way. Plaintiff asserts that another tool was normally used to perform the task, but the tool was broken at the time Plaintiff was instructed to use the claw bar. (Complaint ¶¶ 10–11.) Plaintiff alleges that Defendant "negligently failed to provide the Plaintiff with the proper equipment to remove the switch screws" and that Defendant failed "to provide Plaintiff with a reasonably safe place to work." (*Id.* ¶¶ 15, 17.)

Defendant asserts that a claw bar is a reasonably safe tool and argues that Plaintiff cannot prevail on a negligence claim based solely on its furnishing employees with the

7

claw bar for use in the removal of screw spikes. The record establishes that a claw bar is at times an appropriate tool to use in the removal of fasteners and it is regularly used in the industry even though there are often certain advantages to using a power tool in many circumstances. *See also*, *Pfaffle v. BNSF Ry. Co.*, No. 2:17-CV-0407-TOR, 2020 WL 714155, at *2 (E.D. Wash. Feb. 12, 2020) ("other courts that have addressed the issue have found the use of a claw bar for removing spikes does not present an unreasonable risk of harm"); *Miller v. BNSF Ry. Co.*, No. 15-CV-2268-WJM-NYW, 2017 WL 1862273, at *4 (D. Colo. May 9, 2017) (discussing expert testimony that claw bars "could be used reasonably safely to remove spikes, that 'every Class I railroad permits the use of claw bars to remove spikes,' [and] that it 'is a reasonably safe tool to use to remove spikes'").

To the extent Plaintiff contends that Defendant's negligence consists of the mere fact that Defendant directed Plaintiff to use a claw bar to remove a screw spike, Plaintiff's claim lacks any factual or legal support. Plaintiff has provided no evidence that would allow a factfinder to conclude that a claw bar is an inherently dangerous tool or that it is not a reasonably safe tool for employees to use in the removal of the fasteners. To the contrary, the testimony of Bradley Brown, Plaintiff's son, upon which testimony Plaintiff relies to support his claim, *see infra* Part B, confirms that the claw bar is used to remove fasteners. Accordingly, Plaintiff cannot rely upon the mere fact that Defendant directed him to use a claw bar to remove a fastener to sustain his claim.

The analysis, however, does not end with the determination that a claw bar is a tool that is not inherently dangerous or is a tool used in the industry to remove screw spikes. Plaintiff contends Defendant was negligent in part because it should have provided Plaintiff

8

with a hydraulic machine, the tool that Plaintiff maintains Defendant typically uses to remove the screw spikes. The fact that a safer method for the removal of screw spikes might exist does not necessarily support Plaintiff's negligence claim. As Defendant points out, other courts have noted that a tool or method is not necessarily unsafe just because "there were other, arguably more advanced, methods in use by the defendant" for accomplishing the same task. *Soto v. S. Pac. Transp. Co.*, 644 F.2d 1147, 1148 (5th Cir. 1981); *see also*, *Ezell v. BNSF Ry. Co.*, 949 F.3d 1274, 1282 (10th Cir. 2020) ("to show railroad negligence, FELA requires plaintiffs to show an unsafe workplace—not a failure to provide the safest possible workplace"); *Walker v. Ne. Reg'l Commuter R.R. Corp.*, 225 F.3d 895, 898–99 (7th Cir. 2000) (upholding summary judgment in favor of a defendant who tasked employees with using manual methods rather than mechanical methods and reasoning that "[s]afer methods of lifting may be available, but [Defendant] need only use a reasonably safe method for lifting the blade").

Plaintiff's claim, however, is not limited to the potential availability of a safer method. The issue is whether, under the circumstances in this case, a factfinder could reasonably conclude that Defendant was negligent when it did not provide Plaintiff with a hydraulic machine and directed him to use a claw bar.

The summary judgment record, when viewed most favorably to Plaintiff, reveals that the "screws were normally removed using a hydraulic machine" but the "machine was broken" (Plaintiff's Declaration ¶ 14), and that Defendant directed Plaintiff to use the claw bar because "they were under time pressures and could not wait for another hydraulic machine." (*Id.* ¶ 15.) The record thus would support a finding that Defendant did not follow

9

its ordinary practice (i.e., the use of a hydraulic machine to remove screw spikes) when it directed Plaintiff to use a claw bar. A factfinder could reasonably infer that without the "time pressures," Defendant would have maintained its ordinary practice. Whether under the circumstances Defendant acted reasonably in not securing a hydraulic machine and in directing Plaintiff to use the claw bar is a factual issue that precludes summary judgment in favor of Defendant. Defendant's normal practice, the nature and reasonableness of the "time pressures," the location of another hydraulic machine, and the time necessary to obtain another machine, are among the factors for a factfinder to assess.

As this Court recently observed, "[c]ourts have emphasized that FELA's purpose cautions against removing a FELA case from [the factfinder] except in the rarest circumstances." *Coffin v. AMETEK, INC*., No. 2:18-cv-472-NT, 2021 WL 242418, at * 6 (D. Me. Jan. 25, 2021.) The circumstances of this case, as reflected by the summary judgment record, are sufficient to generate a factual issue for trial as to the reasonableness of Defendant's decision to forgo the use of a hydraulic machine and to direct Plaintiff to use a claw bar.

**B.     Failure to Train**

In the summary judgment filings, Plaintiff argues Defendant failed to train him properly in the removal of screw spikes with a claw bar. Defendant does not dispute, for purposes of its summary judgment motion, that Defendant did not provide Plaintiff with training on the use of a claw bar. Defendant contends, however, that because Plaintiff did not raise the training issue before summary judgment, Defendant did not have the opportunity to explore the issue during discovery, and thus Plaintiff should be foreclosed

from asserting the claim at this stage of the proceeding. Defendant also argues that the record does not support a claim based on a failure to train.

"The fundamental purpose of our pleadings rules is to protect a defendant's inalienable right to know in advance the nature of the cause of action being asserted against him." *Ruiz Rivera v. Pfizer Pharms.*, LLC, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotations marks omitted). The word "training," or other terms to that effect, are not found in the complaint. In its interrogatories, Defendant asked Plaintiff to state what Defendant allegedly did to cause his injury. If Plaintiff intended to pursue a cause of action based on the failure to train, Plaintiff presumably would have referenced training or another term to that effect in his answer to the interrogatory. Instead, Plaintiff responded, "I was told to use a tool that was inadequate to perform the job . . ." (Excerpts of Plaintiff's Responses to Defendant's Interrogatories at 3–4, ECF No. 39-5) and did not mention training. Under the circumstances, Defendant could not reasonably be expected to know that Plaintiff's negligence claim was based on a lack of training.[4]

---

[4] Although Plaintiff did not reference lack of training in his complaint and answers to interrogatories, the deposition testimony not referenced in Plaintiff's statement of additional material facts includes mention of training. When Defendant's counsel asked Plaintiff about the substance of a discussion he had with his son prior to his deposition, Plaintiff testified, "He just asked me if I had ever gotten trained on the claw bar," and Plaintiff responded, "No." (Excerpt of Plaintiff's Deposition at 8.) Plaintiff's son, Bradley Brown, who worked in the railroad industry, was also deposed and provided some testimony about the training he received on methods to use a claw bar safely. (Excerpts of Bradley Brown Dep. at 29–32, ECF No. 40-2 at 23–33.) At least one court has acknowledged that the relevance of an employee's training is unlikely to be a complete surprise when the theory of negligence alleged is the failure to provide reasonably safe tools and equipment. *See Miller v. BNSF Ry. Co.*, No. 15-CV-2268-WJM-NYW, 2017 WL 1880603, at *6-7 (D. Colo. May 9, 2017). In that case, however, the training issue was considerably more developed throughout the course of discovery. *Id.* (discussing the defendant's written safety instructions and an expert witness opinion that the training was insufficient).

Nevertheless, "when a plaintiff raises a claim for the first time in response to a summary judgment motion" it is sometimes appropriate for a district court to exercise its discretion "to treat the claim as a motion to amend the complaint under Rule 15(a) of the Federal Rules of Civil Procedure." *Kunelius v. Town of Stow*, 588 F.3d 1, 19 (1st Cir. 2009). Rule 15(a)(1) permits a litigant to amend a pleading "once as a matter of course," subject to certain time constraints, but when a party seeks to amend a complaint more than 21 days after the filing of a responsive pleading, the other party's consent or leave of court is required. Fed. R. Civ. P. 15(a)(2). In such a case, the court is to grant leave to amend "freely" when "justice so requires." *Id.* "Reasons for denying leave include undue delay in filing the motion, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility of amendment." *U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 48 (1st Cir. 2009); *see also Foman v. Davis,* 371 U.S. 178, 182 (1962).

If leave to amend is sought before the completion of the discovery process, a "futile" amendment is one that "would fail to state a claim upon which relief could be granted." *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996). When a new issue is raised after discovery is closed or in response to a motion for summary judgment, the new issue "must be not only theoretically viable but also solidly grounded in the record and supported by substantial evidence." *See Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 109 (1st Cir. 2002) (quotation marks and modifications omitted); *see also*, *Hatch v. Dep't for Child., Youth & Their Fams.*, 274 F.3d 12, 19 (1st Cir. 2001).

Even if the Court were inclined to construe the training argument in Plaintiff's opposition to the motion as a Rule 15(a) motion, the circumstances do not favor permitting an amendment. "Allowing addition of a new theory of liability after the defendant's . . . motion for summary judgment and after discovery had closed . . . unquestionably would prejudice [D]efendant," *Torres-Rios v. LPS Lab'ys, Inc.*, 152 F.3d 11, 16 (1st Cir. 1998), as Defendant has not conducted discovery on the issue nor considered the need for lay or expert witnesses to testify to the issue. The addition of the lack of training theory at this stage would undoubtedly require further discovery in a case in which discovery has closed. Furthermore, Plaintiff has offered no explanation for the delay in asserting the claim. *See also*, *Martinez v. Petrenko*, 792 F.3d 173, 180 (1st Cir. 2015) ("good cause" is required for leave to amend pleadings after deadline in scheduling order, and "'Good cause' does not typically include a change of heart on a litigation strategy"). Plaintiff suggested at oral argument that the issue developed during litigation. Given that Plaintiff was aware at the time he filed the complaint that he had never used and was not trained in the use of the claw bar, Plaintiff's argument is unavailing. *See id.* (noting that "all of the facts upon which [the plaintiff] belatedly sought to demonstrate [liability] were known to him before he filed his complaint").

Some of the prejudice to Defendant—the fact that Defendant conducted no discovery on the issue and is without any witnesses identified to testify on the issue— arguably could be alleviated by reopening discovery and permitting Defendant to designate lay or expert witnesses on the issue. The time and expense to Defendant of the reopening of discovery, where Plaintiff had the opportunity to assert the claim well before the close

13

of discovery, would not be insignificant. Even without prejudice to Defendant, however, the amendment would not be warranted given the record evidence.

An amendment to allow Plaintiff to argue the lack of training in response to Defendant's summary judgment motion would be futile. Plaintiff's training argument is not supported by competent evidence on the record. Neither Plaintiff's response to Defendant's statement of material facts nor Plaintiff's statement of additional material facts includes the necessary factual evidence to support such a claim. The parties' stipulated facts and statements of material facts lack admissible evidence from which a factfinder could discern the nature of the training that was required, the proper methods for use of the claw bar, and that Plaintiff's injury is a foreseeable risk associated with improper use.[5] Summary judgment in favor of Defendant, therefore, would be appropriate based on the lack of any properly documented factual support for such a claim. *See* D. Me. Loc. R. 56(f) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts").

Even if the Court considered the testimony of Plaintiff's son, Bradley Brown, as Plaintiff urges, the record does not support the claim. Plaintiff did not identify him as an expert witness. His testimony thus would be limited to the testimony he could offer as a lay witness. Bradley Brown, who works in the railroad industry and evidently worked for

---

[5] Local Rule 56 requires a party to admit, deny, or qualify the statements offered by an opposing party, to set forth any additional statements in a separate document with separately numbered paragraphs, and to support each additional statement with citation to record materials having evidentiary quality. Plaintiff did not include in his separate additional statement of material facts a description of Bradley Brown's training or opinions, and Plaintiff did not set forth all the potentially relevant testimony in Bradley Brown's deposition in Plaintiff's denials or qualified responses to some of Defendant's statement of material facts.

Defendant at some point, was not present at the time of Plaintiff's injury, testified during his deposition as to his experience with and training in the use of the claw bar. Bradley Brown's testimony, however, does not suggest he received his training from Defendant, nor did he testify to any of Defendant's practices. His lay testimony as to how he was trained, therefore, is arguably irrelevant and inadmissible.

Regardless of whether he was permitted to testify, as either a lay or expert witness, to the training that he received, Bradley Brown provides no evidence that would establish causation (i.e., that Defendant's alleged negligence any part in producing the injury). Whether training Plaintiff to use the claw bar would have prevented Plaintiff's injury is not apparent from the record. Moreover, whether the way Plaintiff used the claw bar caused the injury does not appear to be within the common knowledge of a lay person. Expert testimony, therefore, would be necessary to establish that Defendant's alleged negligence in failing to train Plaintiff caused his injury. *See Moody v. Maine Cent. R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987) (even under the "considerably relaxed" causation standard in FELA cases, "there must be a sufficient showing (i.e., more than a possibility) that a causal relation existed," and "[e]xpert evidence is often required to establish the causal connection" between the allegedly negligent conduct and the injury, "unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile") (quoting 4 F. Harper, F. James, O. Gray, The Law of Torts § 20.2 (2d ed. 1986)); *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 425 (5th Cir. 2012) (no liability because "no evidence was presented that the osteoarthritis [Plaintiff] had was a kind of

15

musculoskeletal disorder that could occur if a railroad negligently failed to inform its trainmen how to perform their tasks").

During his deposition, Bradley Brown reiterated some training he received regarding the proper stance to minimize the chance of injury from falling. (*See, e.g.*, Excerpt of Bradley Brown Deposition at 30–31 ("if you're not in a stable position, when you pop that claw bar, that head will break off and it completely releases everything -- all the compression all at once, and it will send -- it will send you and the claw bar to the ground").) Bradley Brown also discussed some training that he apparently received regarding methods or how to grip the claw bar to minimize the chance of pinching or strikes from the implement at the high end of the tool. (*Id.* at 29–30 ("a lot of people will apply the claw bar underneath the spike; they'll grab the end of the tool, which they think is giving them more leverage, and then that causes a lot of injuries because at the end of the claw bar there is a pinch bar forged there for a different application," which can "come down and strike employees in the face or in the arm")). Plaintiff does not claim he was injured as the result of a fall, that he pinched or punctured any part of his arms or hands, or that he was struck by the implement at the high end of the claw bar. Bradley Brown's testimony, if permitted, would not allow a factfinder to draw the causal link, even with the low FELA causation standard, between the alleged failure to train and Plaintiff's claimed injury. That is, Bradley Brown's testimony, even if considered as expert testimony, lacks sufficient evidence from which a factfinder could reasonably conclude that Plaintiff's injury resulted from a foreseeable risk associated with insufficient training and improper use of a claw bar. The failure to train theory is not "solidly grounded in the record and

16

supported by substantial evidence." *Watson*, 298 F.3d at 109. An amendment of Plaintiff's complaint to permit Plaintiff to assert a claim based on the lack of training, therefore, would be futile. Plaintiff, therefore, should not be permitted to pursue a negligence claim based on an alleged failure to train Plaintiff.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant in part and deny in part Defendant's motion for summary judgment.[6] I recommend the Court (1) grant Defendant's motion as to Plaintiff's claim that the mere use of a claw bar (i.e., the use under any circumstances) constitutes negligence, (2) deny Plaintiff leave to amend his complaint to assert a failure to train claim or, alternatively, grant Defendant summary judgment on the issue, and (3) deny Defendant's motion as to Plaintiff's claim that Defendant was negligent in directing Plaintiff to use a claw bar to remove screw spikes rather than providing a hydraulic machine for the removal of the screw spikes.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen

---

[6] In his complaint, Plaintiff cited the Federal Locomotive Inspection Act as a basis for his claim. Plaintiff, however, did not argue that the Act provides an independent basis for liability and did not reference the Act when asked for the bases of his claim. (DSMF ¶ 29; Exhibit B to Reichl Dep., ECF No. 39-5.) To the extent Plaintiff's complaint is construed to assert an independent claim based on the Act, Plaintiff has abandoned the claim.

(14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

                      /s/ John C. Nivison
                      U.S. Magistrate Judge

Dated this 13th day of October, 2022.